## Ex Parte R. R. Parker.

### No. 3063.     Decided June 24, 1905.

**Murder—Habeas Corpus—Bailable Case.**

See facts which show a bailable case, and that the judgment of the lower court denying bail should be reversed and the relator permitted to enter into recognizance or give bond.

Appeal from the Criminal District Court of Dallas. Tried below before Hon. E. B. Muse.

Appeal from an order remanding relator to the custody of the sheriff without bail on proceeding by habeas corpus.

The testimony in this case is so voluminous that it becomes impracticable to reproduce it all; but the substantial facts are contained in the testimony of the principal witness for the State, Flora Taylor, whose examination in chief is given, and that of the relator himself, which is also reproduced. There were several witnesses for the relator whose testimony showed that the State's witness Flora Taylor could not have been in the room when the shooting occurred, thus corroborating the relator and one of his witnesses that she was not then in the room; on the other hand other witnesses for the State tended to corroborate her testimony as to this point. There was also some conflict as to the position of the parties; the place where the pistol was taken from; the language of the parties used at the time of the difficulty; the question of malice arising from remarks by relator; the question of self-defense; the fact that two eye witnesses to wit: A. B. Rawlins, the clerk, and Mrs. R. R. Parker, relator's wife, were not placed on the stand; that witness Flora Taylor in an interview in the newspaper had made a different statement from that on the stand, etc.

Mrs. Flora Taylor, a witness for the State, being duly sworn, testified as follows: "My name is Flora Taylor. On the 3rd day of last April I was working in Titche-Goettinger's store in the morning. I

was in the shoe department at work. I left the store about 11:30 o'clock a. m. and went to Mr. E. J. Bell's office. I got to Mr. Bell's office about 12 o'clock, and went with Mr. Bell to the district clerk's office at the court house. Mr. Rawlins, the district clerk, was there when we arrived at his office. Mr. Parker, the relator, was not there when we reached the office, but came within a few minutes. I don't know just how long it was. Mr. Bell and Mr. Rawlins were engaged in conversation, when Mr. Parker arrived there, with reference to my divorce case. I had been in the office a very few minutes,—I don't know just exactly how long. Yes, when Mr. Parker arrived, he and Mr. Bell had some conversation;—I don't know which of them first addressed the other. I don't remember the first thing that was said by either of them after Mr. Parker arrived.

Mr. Bell was speaking to Mr. Rawlins when Mr. Parker entered, about my divorce case and about a conversation that Mr. Parker and I had had a few days previous and a paper that I had signed. Mr. Bell told Mr. Rawlins in the presence of Mr. Parker that he thought Mr. Parker had not done right by getting me to sign this paper. Told him he knew it was all right as far as law was concerned, but did not show him any consideration whatever; that he had gotten me to sign this paper stating that I would pay a certain sum, or my case would be thrown out of court, and Mr. Bell objected to that, and Mr. Parker stated that he was only trying to secure the costs in the case, and Mr. Bell said that was all right, but he did not think he had shown him any consideration of me by going right over his head and seeing me about it without letting him know about it. Mr. Parker drew a paper out of the desk that I had signed, something about the costs in the case, I didn't understand exactly what it was. He showed Mr. Bell the paper and there was some remark made about it; I don't remember just what remark was made; Mr. Parker made some remark to Mr. Bell, and then Mr. Bell told him that he had not asked any favors of the office before; that he had been practicing law quite a number of years before, and never in his knowledge filed a case just like mine, and that hereafter, if they would not accord him any favors that they need not expect any favors of him. Mr. Bell said that he would not expect any favors from the office, and they need not expect any from him; that he would deal with the office at arms length hereafter. Mr. Parker then asked him if he wanted to make it a personal matter, and Mr. Bell says: "You can if you wish," and that was the last I heard Mr. Bell say before the shooting. Mr. Bell was standing right at the desk where Mr. Parker was, between the door and the desk and just as he made that remark, he could make it a personal matter if he pleased, Mr. Parker drew a gun and fired. He shot twice at Mr. Bell. Mr. Parker was just in front of his desk and Mr. Bell was right at the end of the desk at the time Mr. Parker shot. They were so near together that if he threw out his hand he could almost have touched him; he was right close to

him. Mr. Bell was just standing at the end of the desk at the same time he was shot. If he made any demonstration, I did not notice any at all. His hands were at his side. When the first shot was fired I was standing about three or four steps from the door leading into the hall, just between the door that leads into the other office and the one leading into the hall. I was in the room when the first shot was fired. I don't know what either Mr. Bell or Mr. Parker did after shooting; I left immediately. I walked out real fast and went up the street to my home. I went out of the door leading into the small hall, and then into the corridor of the courthouse. I don't know what Mr. Parker did after the shooting. The shooting that I have detailed occurred in Dallas County, Texas, on the 3rd day of April, of this year. The signature on the paper is my signature. That is the paper that I referred to. That is the paper Mr. Parker took out of his desk in the conversation between he and Mr. Bell."

Robert R. Parker, the relator, being duly sworn testified in his own behalf as follows: "My name is Robert R. Parker. I was 34 years old on the 11th of April, 1905. I was born in Tennessee, and my father and mother brought me to McKinney, Texas, when I was about a year old. My parents are both living at McKinney, Texas, now. I am a married man. I knew Frank J. Bell in his life time. I knew him by sight for something over two years before his death. I never became personally acquainted with him until the 9th day of January, 1905. He was an attorney. I was deputy district clerk and employed by A. B. Rawlins, in the district clerk's office at the time I met him. Mr. Rawlins became district clerk on the 1st day of December, 1904, and I entered the office at that time as chief deputy under him. Mr. Bell filed a suit in the district clerk's office on January 9, 1905, and that is how I became acquainted with him. This is the petition he filed. (Witness was here shown the petition and identified it.) It was the petition in the case of Flora Taylor v. Joe H. Taylor, No. 15, and was filed by myself, Robert R. Parker, deputy, on the 9th day of January, 1905. That is a local citation. (Witness was here shown and identified the citation issued in said suit.) That paper was issued on the afternoon of January 9, 1905, by Robert R. Parker, myself as deputy clerk. That is a contest of an affidavit in lieu of cost bond. (Witness was here shown and identified the motion to contest the affidavit in lieu of cost bond filed in said cause.) That motion to contest was prepared by me, Robert R. Parker, and filed by me as deputy clerk in the case of Flora Taylor v. Joe H. Taylor, No. 15, on the 9th day of January, 1905, the same day on which the citation was issued. I did not know Mrs. Flora Taylor at the time, and had never seen her. Mr. Bell filed the petition with me at my desk in the district clerk's office. My desk at that time was situated in the south room of the office, which was in the southeast corner of the courthouse. My desk at that time was not where it was on the 3rd day of April, 1905, but was in a different room. Mr. Bell

came in and handed me the petition and asked me to file it. I filed it and he asked me to issue on it immediately. I then asked Mr. Bell if he was familiar with the rules of the office in regard to divorce cases, and he said that he understood that we were exacting, and asked what the rules were. I then repeated the rules that were in vogue at that time. I told Mr. Bell that in divorce cases, where there was a waiver of service filed we required a deposit of $5; that where the service was local citation issued to Dallas County, we required a deposit of $7.50; that where the citation was to some other county or notice issued out of the State we required a deposit of $10; that where the citation was to be served by publication we required a deposit of $12.50; and that under the rules he would either have to make a bond for costs or make the deposit required by the rules. Mr. Bell asked me if we lived up to that rule with all attorneys? I told him we tried to and had so far. He said that it was more exacting than had been reported to him. He said that Henry Jones or Henry Williams had never required him to make a deposit. I told him that the rules had been established after we had gone into office and we were going to make an effort to carry it out, and he asked me why we had established such rules, and I explained to him in a general way in regard to the delinquent costs that were standing uncollected. I told him that there was on fee books of Dallas County at that time something from $25,000 to $40,000 or $60,000 delinquent costs; that we had not begun working on them, but that we knew they were very large and it was probable that we would never collect over fifteen or twenty per cent. of that amount. I then told him that Mr. Rawlins thought it was nothing but right and justice to the county that the rule should be established, by which the delinquent fees would not occur; that the costs in the cases should be protected in every manner, and that we had adopted that rule. Mr. Bell said he did not see how that rule would affect him. He said that Mr. Jones and Mr. Williams had never requested him to make a deposit or make bond. I told him that we had adopted that rule and could not violate it; and that we were treating all of the lawyers in Dallas alike. Mr. Bell said that it was attacking the honesty and integrity of the attorneys of Dallas County to adopt such rules. I told him that we never questioned the honesty or integrity of any of the attorneys in Dallas, but that it was a rule adopted and every attorney would be treated the same. Mr. Bell then asked: "How do you treat affidavits in lieu of a cost bond?" I told him that we accepted the affidavits just the same as they had always been accepted, but that we reserved the right to investigate the party making the affidavit to see if they were worthy parties. Mr. Bell said that he thought that was a very poor policy and he thought that would make enemies among the local attorneys. I told Mr. Bell that we were trying to run the office on the best basis and had established these rules, which we would try and follow out. Mr. Bell then said that he would file an affidavit shortly

and turned and walked out of the office. Mr. Bell came back in a few hours and handed me an affidavit to be filed in lieu of a cost bond. I think I filed it; I am not sure, but I told Mr. Bell that I would investigate immediately and if I found the party not able to pay the costs I would telephone him. I told him that .if she was unable to pay the costs I would issue the service to the sheriff. He said he would not agree to that, that he wanted service immediately. I told him I could not issue on it, that we reserved the right to make an investigation. He said that was an unreasonable rule and put the attorneys to entirely too much trouble, and questioned their honesty. I told him that I could not help it, that we would have to comply with the rule that had been established. He then said give me the affidavit; I handed it to him and he walked out to Mr. Rawlins. I do not know what he said to Mr. Rawlins, but shortly after, in a few minutes, Mr. Rawlins and Mr. Bell came back to the desk and Mr. Rawlins asked me what was the matter that I did not issue in the case? I told him that I was merely following the rule that he had established and that I had no right to violate it. I explained the conversation to Mr. Rawlins and Mr. Rawlins turned to Mr. Bell and said: 'It is a rule that has been established and we cannot violate it for you. We cannot violate it for any of the attorneys, for if we violate it for one party, we will have to violate it for the others, and you will have to comply with the rule.' Mr. Bell said that he would not do it and that he would go to the court and force us to issue on it; that we had no right to hold up service after an affidavit had been filed. I asked him not to do that, to give us time to make an investigation and asked him where Mrs. Taylor was. He replied that she worked at Titche-Goettinger's. I told him that it would only take half or three quarters of an hour at the outside to make an investigation; he said he would not wait for it, that he was going to have service. They walked out and Mr. Rawlins came back in a few minutes and Mr. Rawlins told me to issue a receipt for Mr. Bell and handed me $5. I issued the receipt and handed it to Mr. Rawlins. Later I turned to the machine and issued the citation and handed that to Mr. Bell. Later in the evening I turned all my money that I had collected during the day over to Mr. Rawlins. While I was turning the money over to him, I made the remark, I wonder if Mr. Bell paid that out of his own pocket. Mr. Rawlins said no, that he paid it himself, I remarked to Mr. Rawlins that I would file a contest in the case; I turned to my desk and issued a contest and filed it. That is a copy of the motion I filed to contest the affidavit in lieu of cost bond. (Witness was here shown and identified the motion to contest the affidavit in lieu of cost bond.) When Mr. Bell brought the pauper's affidavit to me, I think I filed it and sent it upstairs to the clerk to be entered upon the motion docket. I do not know what became of the pauper's affidavit. There never was a cost bond filed in that case. That is the petition in the habeas corpus proceedings. (Witness was

here shown and identified a petition as the petition in a habeas corpus proceeding brought by Joe Taylor against Flora Taylor for the possession of their children.) That was filed January 10th, 1905, by M. F. Winter, deputy district clerk, it was sent from the court, where it was filed, to the main office to be issued on. That is an answer filed by the defendant, Flora Taylor in the habeas corpus proceedings brought by her husband. (Witness was here shown and identified the answer filed by Flora Taylor in the habeas corpus proceeding.) That is the notice of citation issued upon the original application for habeas corpus. Witness was here shown and identified the notice of citation issued on the original application for the habeas corpus.) I issued that notice. I wrote the application for habeas corpus at the time I issued the notice on the day the case was filed. All of those papers in the habeas corpus proceeding brought by J. H. Taylor against his wife, Flora Taylor, for the possession of the children were in cause No. 17. That is the direct interrogatories propounded to witnesses in Tennessee in the case of Mrs. Flora Taylor v. Joe H. Taylor, being cause No. 15. (Witness was here shown and identified the interrogatories propounded in said case to witnesses in Tennessee.) I first became acquainted with Mrs. Flora Taylor on the 15th day of March, 1905, and had never seen her before that time. I met her on the day those interrogatories were filed. I had already read the interrogatories. After reading the interrogatories, I saw Mrs. Taylor that day in the office of the district clerk, I telephoned her and asked her to come to the office, after I had read those interrogatories and she came. After she came, at her request I gave her the interrogatories and she read them while sitting near my desk in the district clerk's office. At that time my desk was in the south room. After reading them, she did not say anything or make any remark. That is the receipt I gave Mr. Bell, when so requested to do so by Mr. Rawlins, for the sum of $5 deposited on costs in the divorce case. (Witness was here shown and identified the receipt.) I signed it as Mr. Rawlins' deputy. Mr. Rawlins paid me the money at that time. Mr. Bell was in the front office, I handed the receipt to Mr. Rawlins, I do not know what he did with it. At the time I wrote the receipt, I believed that Mr. Bell had put up the $5 as a cost deposit, but I subsequently learned on the same day from Mr. Rawlins that he put up the money. Prior to the 15th of March, 1905, I had never seen Mrs. Flora Taylor. That is the contract I made with Mrs. Taylor on March 15, 1905, in regard to the payment of costs. (Witness was here shown and identified the contract.) On the morning the direct interrogatories were filed, I saw that the costs in the case would probably run up to $50 or more. I saw that the process on the interrogatories alone would cost $25 or $30; I believed that it was my duty to talk to Mrs. Taylor and see if there was not some way of her protecting us on the costs in the case. I telephoned to Mrs. Taylor and asked her if it was convenient for her to come down and talk to me some time.

She said it was. Shortly after that she came into the office and took a seat near my desk and I explained to her that the depositions had been filed and that the process on the depositions alone would probably run $25 or $30 and asked her if she could not in some way secure the costs. If there was not parties in town that would be willing to go on her bond. She said she did not know. I asked her if she had made any arrangement to pay her attorney's fees and she said she had; I then asked her how she expected to pay her attorney's fees and she said that Mr. Bell had agreed to let her pay it in weekly payments. I then asked her if she could arrange to pay the costs in the same manner and she said she thought she could. I then asked her if she thought she could pay $10 by Saturday and she said she was sure she could pay that much by that time. I then asked her if she thought she could pay as much as $2 per week until the rest of the costs were paid, and she said she could; she said she was receiving a salary of $8 per week and she was satisfied she could meet those terms. Then I asked her if in case she should fail to comply with the agreement if she would be willing for the clerk of the court to dismiss the case and she said she would. I then turned to my machine and drew the contract, but instead of making the first payment $10 the following Saturday, I made it, I believe the 27th of March, which would give her one week longer. After drawing the contract I handed it to Mrs. Taylor and asked her to read it and she did so and handed it back to me and I then fully explained it to her and told her that Mr. Rawlins had deposited $5 in the case, and that Mr. Bell had refused to make any arrangements other than filing the affidavit in lieu of the cost bond. She said that the arrangement was entirely satisfactory to her. That was the end of our conversation and she went away. Before leaving she signed the contract and I swore her to it. I took that oath to identify her signature and show that it was genuine. She then left the office. She made no complaint whatever about that arrangement while she was in the office that day and expressed no dissatisfaction whatever at my calling on her for the costs. I next saw Mrs. Taylor on the 3rd of April, 1905. I filed the agreement which Mrs. Taylor signed on March 15th in a drawer of my desk that I file all contracts and agreements in. On the 16th of January, I had withdrawn, the contest which I had filed on the 9th day of January against the pauper's oath. At the time I made the contract with Mrs. Taylor with respect to the costs on March 15, 1905, there was no pauper's oath or cost bond or deposit on file in the office, except the deposit of $5 which had been made by Mr. Rawlins out of his own pocket; that was still standing. Yes, I saw Frank Bell between the 15th of March and the 3rd day of April, with reference to this matter.

About a week after Mrs. Taylor signed the contract with regard to costs, I cannot be positive with regard to the exact time, Mr. Bell came into the office. I had then moved my desk in the front

office, or north office, and when he came in he said: "Mr. Parker, I understand you have forced Mrs. Taylor to sign an agreement?" I told him that I had not forced Mrs. Taylor to sign any agreement; that she signed the agreement and that it was fully explained to her and she signed it of her own free will and accord, and while I was speaking I handed Mr. Bell the agreement which had been signed and acknowledged by Mrs. Taylor. Mr. Bell said that this agreement was not legal and that it was an outrageous proceeding for any public officer to take. I told him that we would try to comply with the terms of the agreement. Mr. Bell said that he would go before the court and make an effort to have that agreement set aside and force the clerk of the district court to continue service in the case. I told him that I had given him all the service that had been asked for and would give him any further service that he wanted but that the agreement must be complied with. Mr. Bell left the office. That is not all the conversation; I cannot remember every word of it, but I did not see him any more until the 3rd of April, 1905. At the time Mr. Bell had that conversation with me, he seemed to be very indignant and angry. Yes, Mr. Bell read the contract when he was in there on that occasion. I cannot say positively who was in the office when Mr. Bell came in on that occasion. I think that there were one or two parties in the office. I think there was a party by the name of Patterson, an insurance man in Dallas, but as to who else was in there, I cannot say positively. Tildon Jackson was sitting in the other room at his typewriter, but was not in the front office. Mr. Bell was alone when he came to see me on that occasion. I do not know of any other business that Mr. Bell had in the office at the time he came in and had that conversation with me and read the contract. He did not mention any other business. He never filed any motion in the district court for the cancellation of this contract and for process. The commission had issued on those interrogatories at the time Bell came in and had this talk with me and looked at the contract, and I had turned the precept over to the sheriff's office. The copy and precept had both been issued. Mr. Bell did not on that occasion or at any time thereafter, call on me for any process and neither did Mrs. Taylor. I next saw Mrs. Taylor on the 3rd of April, 1905. * * * * * * * * * * * * On the 3rd of April, 1905, I saw Mr. Bell and Mrs. Taylor in the north room of the district clerk's office; Mr. Rawlins was with them, it was probably fifteen or twenty minutes after twelve o'clock. I did not see them when they came into the office, for I was at lunch. I took my lunch that

day at Harvey's cafe on Main Street with my wife. . After lunch I returned to the district clerk's office and went into the door leading from the hall into the north room of the office, and then through the north room into the south room, my wife was with me. Tildon Jackson was in the south room and Mrs. Taylor and Mr. Bell and Mr. Rawlins were in the north room where my desk was. I did not speak to any of them as I passed through the north room. They were all standing near my desk between the corner of the file cases and over towards my desk. When I went into the south room where Tildon Jackson was, with my wife, I told her to take a seat and she sat down in a chair in front of Mr. Rawlins' desk. Tildon Jackson was in that room said to me: "Go in Bob, and take your medicine." I then went into the north office, and went to my desk and sat down. I passed west of Mr. Bell, Mrs. Taylor and Mr. Rawlins, and passed around their left and my right and sat down in my chair in front of the desk. I took up my work where I had left off before going to lunch, filing some instruments that I had started to file before leaving. At that time Mrs. Taylor, Mr. Bell, and Mr. Rawlins were in the room. I had filed two instruments when Mr. Bell spoke up and said to me: "I want to talk to you about Mrs. Taylor's case Mr. Parker." I said sit down Mr. Bell and I will be at leisure in a moment to talk to you. Mr. Bell then said: "I will not sit and talk to a scoundrel." I then turned my chair facing him and said: "It is not necessary Mr. Bell to become insulting, we can omit personalities and confine ourselves to Mrs. Taylor's case." Mr. Bell then asked what I was going to do about the contract, which he said I had forced Mrs. Taylor to sign. I says: "I did not force Mrs. Taylor to sign any contract and I fully explained it to her." While I was talking I reached up and got the contract and handed it to Mr. Bell. Mr. Bell said, you obtained this agreement in an underhanded way, you should have come to me as Mrs. Taylor's attorney and not passed over my head and gone to a woman and taken advantage of a woman who knows nothing about legal matters. I said, I did come to you Mr. Bell, when the case was first filed and through your action you forced Mr. Rawlins to deposit $5 in the case and when attorneys arrange for their own fees and fail and refuse to provide for the clerk's costs, we have a right to go to the client. Mr. Bell then became very angry, and said: "You have handled this case in a high-handed, unprincipled manner, unheard of during Henry Jones' or Henry Williams' administration. In the future I will deal with this office at arm's length and will make a personal effort to see that you do not have the opportunity of continuing this practice after this term." About that time Mr. Rawlins spoke to Mrs. Taylor and asked her how long she had lived in Dallas. She told him that she had lived here about a year, and he then asked if she had any friends or relatives here, and she said Lex Moore and E. T. Moore were her cousins. Mr. Rawlins told Mrs. Taylor that he would ac-

cept them as securities in the case, and asked her if she thought they would go on her bond? She said she did not know, but she would see them. Mr: Bell then spoke and said: "I want it distinctly understood that from henceforth I am an enemy to this pusilanimous gang conducting the affairs of this office." And then turned to Mrs. Taylor and they walked to the door and walked out. Mr. Rawlins turned and walked to wards the southwest corner of the room; I turned to my desk and took up my work where I had left off. Mr. Bell then re-entered the room and as he got near me said: "I will make this a personal matter, you infamous scoundrel." I glanced up as I. heard these words and saw him taking hold of a chair. I drew open a drawer of my desk and grabbed my pistol and as I wheeled in my chair I fired twice in quick succcession, Mr. Bell then released the chair and turned. My wife came running in and I got up and met her. Mr. Bell walked on in the other room. Mr. Rawlins put his hand on Mr. Bell's arm and said sit down here. Rawlins then came to my wife and myself and we turned and walked across to the deposition case sitting on the left hand side of the room, and my wife sat down by the side of the deposition case; Mr. Rawlins said give me the pistol Bob, and I told him it was in the drawer. "Let me go over to the desk." He then repeated, give me the pistol Bob, and I then walked over to my desk and sat down in the chair, my wife sat down a little to the back of me and Mr. Rawlins sat to the right. There was a large crowd in the room and some one said put the crowd out; I got on my feet and asked the officer to put the crowd out and then sat down at my desk again and picked up my pen and started to finish the work that I. had begun before and after that time. Mr. Ledbetter says, "Let's go, Bob," but I says wait a minute until I explain to Mr. Rawlins about the unfinished work. He says let's go, for Mr. Bell's friends will be here. I then turned to Mr. Rawlins and tried to explain the work that was lying on my desk and needed attention that day. My wife and I came on down to the county jail and I have been there ever since." On cross-examination this witness testified that both he and deceased were very much excited and witness thought deceased was going to strike him with the chair, which was heavy; that witness was much excited and had not recovered from the excitement of the previous quarrel when he fired the shots at deceased; and that he did so sitting in his chair; that he believed his life was in danger; that he had put the pistol in his desk two or three weeks previous to the shooting, etc.

*Muse & Allen* and *Crawford, Lamar & Crawford,* for appellant.—The fact that the respondent failed to call A. B. Rawlins, the district clerk, as a witness, who by all of the witnesses is shown to have been present in the room in which the difficulty occurred before, at and after the difficulty, and whose name is endorsed first on the bill of indictment as one of the witnesses on whose testimony the indictment was

found; the other witnesses, being Flora Taylor, Dr. Reeves and Dr. Baird,—is undoubtedly a circumstance which admits of an inference unfavorable to the respondent and justifies the court in believing that the witness Rawlins would not have supported or corroborated the witness Flora Taylor. Gray v. Burk, 19 Texas, 233; Tipton v. State, 30 Texas Crim. App., 530; Mercer v. State, 17 Texas Crim. App., 452; M. P. Ry. v. White, 80 Texas, 202.

In this case, the burden was upon the respondent to show by proof evident the guilt of the relator; the respondent rested his whole case as to the facts of the difficulty upon the testimony of Flora Taylor. She, alone, swears that when the shooting occurred she was in the room and witnessed it, and gives her version of the facts leading up to the shooting and attending it. The relator and Henry Jacoby swore that she was not in the room when the shooting occurred; the witnesses, Lee, Jett and Jackson, gave testimony strongly corroborative of the relator and Jacoby. She, alone, swears that the relator was standing when he shot Bell, and that Bell's hands were by his side, when he was shot. The relator swears that he was sitting in his chair when both shots were fired, and that Bell had hold of another chair and was raising it to strike the relator just having said: "I will make this a personal matter, you infamous scoundrel." The testimony of Dr. Reeves as to the course of the balls through the body and the physical facts, the distances and the pistol [ball?] in the west wall of the room; if they do not demonstrate the truth of the relator's testimony as we contend they do at least render its accuracy highly probable. Flora Taylor swears that the relator took the pistol from the upper drawer of the right hand corner of Parker's desk. The relator swears that he took it from the middle drawer. Tildon Jackson swears that he saw the pistol in the middle drawer, and that the right hand upper drawer described by Flora Taylor, was cut up and partitioned into four inch compartments and was used for keeping the filing and certificate stamps. Flora Taylor is self-contradictory as will appear by a comparison of her testimony in chief with her interview given on the evening of the killing and published in the Dallas News of April 4th, and swore on cross-examination by her to be correct except as to the pauper's oath. Ex parte Miller, 41 Texas, 213; Ex parte Rothchild, 2 Texas Crim. App., 560; Ex parte Coldiron, 15 id., 464; Ex parte Foster, 5 id., 625.

*Howard Martin,* Assistant Attorney-General, and *Robert B. Seay* and *A. B. Flanary,* for the State.—The State submits that the trial judge in passing upon the credibility of the witnesses, the weight to be given their testimony, in view of the constitutional requirements as to the degree of proof required to support a refusal of bail, has not exceeded his prerogatives and no abuse of his discretion is shown; and that this court should approve the same and decline the application of the relator for bail. Ex parte Pace, 20 S. W. Rep., 922; Ex parte

Cash, 24 S. W. Rep., 408; Ex parte Kennedy, 57 S. W. Rep., 648; Ex parte Smith, 23 Texas Crim. App., 100.

DAVIDSON, PRESIDING JUDGE.—Under habeas corpus proceeding relator was remanded to custody without bail for the killing of F. J. Bell. Several questions are presented for revision by bills of exception in regard to the rejection of testimony. We pretermit any discussion of these questions; and express no opinion in regard to the matters presented by these bills. This is a matter purely of bail on the record, and we will not undertake to discuss errors or supposed errors of the judge in rejecting or admitting certain facts. This might become more or less important before a jury, but not on habeas corpus where bail is the only question.

We have reviewed the case as presented, and are of opinion that it is bailable. We are further of opinion that the bail should be fixed at the sum of $10,000, which is accordingly done. The officer having relator in custody will take his bail in the terms of the law for that amount, unless the court should be in session. Of course, then relator will be required to enter into recognizance in open court. The judgment is therefore reversed, and the relator granted bail in the sum of $10,000.

*Reversed and bail granted.*